**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

ZACHARY CHERRY,

                Plaintiff,

v.

ACGT CREATIVE, INC. AND LAURA
SCHECHTER,

                Defendants.

**COMPLAINT**

**JURY TRIAL DEMANDED**

**DYNAMIS LLP**
Constantine P. Economides
Fla Bar #118177
1111 Brickell Ave., 10th Floor
Miami, FL 33131
(305) 985-2959
ceconomides@dynamisllp.com

Eric Rosen (*pro hac vice* forthcoming)
225 Franklin Street, 26th Floor
Boston, MA 02110
(617) 802-9157
erosen@dynamisllp.com

*Attorneys for Zachary Cherry*

Plaintiff Zachary Cherry ("Cherry" or "Plaintiff"), by and through his attorneys, brings these claims against Defendants ACGT Creative, Inc. ("ACGT") and Laura Schechter ("Schechter") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1.      In 2021 and 2022, Zachary Cherry was living his ideal life: quiet, responsible, highly productive, focused on family and his work. He held a senior executive position at a thriving media production startup called ACGT Creative, Inc. He was engaged to the mother of his beloved son. And he was living part-time in New York, the greatest city in the world.

2.      At ACGT, Cherry felt like he was flourishing. He was rounding up new investors and partners. He was managing the short- and long-term operations of the company. And while his colleagues were sometimes unorthodox in their management style, especially CEO Laura Schechter, it was the best job Cherry had ever had. He was a high-performing team member in a high energy, all-hands-on-deck environment, and his management expertise was a vital aid to keeping ACGT running.

3.      All of this changed the moment ACGT's cash ran short. By summer 2023, Schechter's high-risk business decisions and her self-dealing loans (which included her own drug rehab payments) had piled up to the point that there was no reasonable route for ACGT to remain solvent for more than a couple more months. At that point, Cherry found himself the target of intense criticism for the management and finance practices that had been fully accepted only months before. Ultimately, in August 2023, Schechter fired Cherry.

4.      But this was far from the end. In an effort to cover up her own mismanagement and misappropriations of significant company funds, Schechter, together with others, went on to

repeatedly and intentionally defame Cherry by, amongst other things, spreading vicious lies accusing him of embezzling company funds and being the cause of ACGT's dire financial straits.

5.      Schechter and ACGT repeated this story to their investors, to their contractors, and then to law enforcement agencies. Suddenly Cherry found himself the target of police action, found his relationships crumbling, and saw his employment prospects vanishing. In fact, despite numerous attempts to find work, Cherry has been unable to become gainfully employed since Schechter and ACGT began spreading their lies.

6.      Cherry now comes before this Court to seek compensation for the false and defamatory statements made about him by Schechter and ACGT. Driven by cowardice and animosity, they have inflicted severe and permanent harm in an effort to cover up their own misdeeds—they must make him whole.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between Plaintiff and all Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      This Court has personal jurisdiction over Defendant ACGT Creative, Inc. pursuant to Fla. Stat. § 48.193 because Plaintiff's causes of action arise from ACGT's conduct—as alleged herein—of committing tortious acts within this state and breaching its contracts with Plaintiff by failing to perform acts required by the contracts to be performed in this state.

9.      This Court has personal jurisdiction over Defendant Laura Schechter pursuant to Fla. Stat. § 48.193 because Plaintiff's causes of action arise from Schechter's conduct—as alleged herein—of committing tortious acts within this state.

10.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

11.     This Court is empowered to issue declaratory judgments pursuant to 28 U.S.C. §§ 2201–2202.

## PARTIES

12.     Plaintiff Zachary Cherry is a United States citizen who resides in West Palm Beach, Florida. Cherry was the Chief Operating Officer ("COO") of Defendant ACGT Creative, Inc. from March 2020 to August 2023.

13.     Defendant Laura Schechter is a United States citizen who resides, upon information and belief, in East Chatham, New York. Schechter is the Chief Executive Officer ("CEO") of Defendant ACGT Creative, Inc., as well as its majority owner, with an 80% share of the company.

14.     Defendant ACGT Creative, Inc. is a corporation organized under the laws of Connecticut and has its principal place of business at 2389 Main Street, Glastonbury, Connecticut. ACGT also does business as StoryMatter and as StoryGiants. ACGT is a media production company and owns a variety of subsidiaries in the business technology and the technology media industries. Through its subsidiaries Hookline LLC and Glasstown Entertainment, it owns a portfolio of original TV, film, and book IP rights, an AI product suite, and proprietary software for augmented reality and animation.

## STATEMENT OF FACTS

### A.      Cherry Joins ACGT.

7.      Zachary Cherry is a veteran of the C-suite and a highly experienced financial analyst. Since earning his business economics degree from an Ivy League university, he has held

a series of high-performing and high-trust positions in the financial services and media industries, including at Solomon Brothers and Neuberger Berman. Cherry was also the co-founder and Managing Partner of Caerus Ventures.

8.     In or about September 2019, Cherry's then-fiancée introduced him to her friend Laura Schechter. Cherry's fiancée and Schechter were close friends from the publishing world.

9.     Cherry's fiancée knew that Schechter was starting a new venture, to be called ACGT Creative, Inc., and that Schechter was looking for an operations executive to join the team and help recruit investors. Cherry's fiancée thought Cherry was the right person for the job.

10.     Cherry met and befriended Schechter, and he agreed to work for ACGT. He found the startup so compelling that he agreed to work off-contract for approximately six months to help ACGT secure financing.

11.     Cherry began working for ACGT in September 2019 and spent the next six months successfully courting investors. By March of the following year, enough cash had been brought into the company accounts such that the team could sign their contracts and begin drawing salaries.

12.     On or about March 14, 2020, Cherry was officially hired to work for ACGT as COO under a signed agreement ("the March 2020 Agreement"). His offer letter provided for a base compensation of $150,000 per year (paid every two weeks) starting once ACGT had raised $250,000, as well as 3% equity in ACGT with a 1-year "cliff" and a standard 4-year vesting period. The offer letter also included the following clause in the Compensation section, consistent with his function as COO of the company: "Expense Coverage: Company shall issue Zac a corporate card or implement a similar standard reimbursement mechanism for customary expense coverage for travel, capital raising and/or company marketing expenditures." A true and correct copy of the March 2020 Agreement is attached hereto as Exhibit A.

13.     As COO, Zachary Cherry ran ACGT's daily and long-term operations; had the authority to hire, contract, and partner on behalf of ACGT; and had access to all company funds. His extensive experience in investment, financial decision-making, and business growth and development was seen by Schechter and the other team members as a huge benefit for the new company. Additionally, Cherry's skill at finding and recruiting investors was a fundamental asset and a driving factor for ACGT's success and growth.

14.     At the time of Cherry's hiring at ACGT, the company had no formal financial reporting, controls or safeguards. Schechter and the ACGT team trusted Cherry to manage their operations effectively, efficiently, and accurately because of (at least in part) his strong personal integrity.

15.     On or about March 30, 2020, ACGT closed its first financing round, raising $750,000 in convertible notes. The notes' maturity date, on which they could either be redeemed for face value or converted into equity, was March 30, 2023.

16.     The financing round was syndicated and underwritten by a group of investors led by Cherry's then future father-in-law. This group also included a friend (and her husband) of Cherry's then-fiancée, who invested $250,000, making them (together with another of Getter's contacts) the largest investors in this financing round. One hundred percent of this first, crucial financing round for ACGT was sourced from Cherry and his fiancée's friends and family.

17.     Throughout this time, Cherry was fully invested in the future of ACGT, and was a firm believer in the company's prospects for success.

**B.**    **ACGT's Decline.**

18.    With this financing in the bank, ACGT entered a new stage of operations, in which the company would begin to build a media portfolio and start to act as the production company it was intended to become, even as it continued courting new investors and partners.

19.    Unfortunately, a series of financially devastating choices by Schechter would ultimately leave ACGT gasping for cash and on the edge of bankruptcy.

20.    First, Schechter determined that ACGT would acquire and fund the production of the Bahamian television show Goombay Kids, a radical departure from the company's original business model. Thanks to her single-minded focus on this target, the ACGT team wasted over a year's time negotiating the deal and spent over $500,000 of their working capital solely on obtaining the rights and producing the show. The rest of the ACGT board, including Cherry, had advised against pursuing this target, but Schechter persisted. The Goombay Kids deal closed in or about May 2022. By December of that same year, it was clear to all that the production was a failure.

21.    On information and belief, ACGT would not have entered into the Goombay Kids deal but for Schechter's determination to acquire and produce the show.

22.    Second, in or about the fourth quarter of 2022, Schechter made the decision to purchase a 49% stake in Glasstown Entertainment ("Glasstown"), a book publishing company co-founded by Schechter and her business partner.

23.    Prior to the buyout, Glasstown was co-owned by Schechter and her business partner. While the business partner was Glasstown's purported manager, Schechter had repeatedly made and forgiven loans to Glasstown to keep it solvent. Schechter's intent with the buyout was to push out her business partner and consolidate her control through ACGT.

24.     In or about March 2023, shortly prior to transaction close, as Cherry was analyzing the Glasstown financial documentation and accounts, he discovered that Schechter's business partner had hidden $120,000 in undisclosed liabilities. He promptly raised this issue with Schechter and the ACGT board.

25.     In or about April 2023, the ACGT board weighed the question of whether or not to abandon the Glasstown buyout in light of this conduct by Schechter's business partner and the far worse economics of the deal.

26.     Rather than put the question to the full board, Schechter pushed the deal through, forcing ACGT to absorb the $120,000 in costs and allowing her old business partner to reap a windfall.

27.     On information and belief, ACGT would not have entered into the Glasstown buyout were it not for Schechter's determination to close the deal.

28.     Third, throughout this period, Schechter used ACGT's working capital as her own personal slush fund. Schechter would regularly use her corporate card for large personal purchases, including airfare, hotels, gym memberships, and spa treatments.

29.     Worse, Schechter regularly drew on ACGT's funds to pay her personal taxes, mortgages, and car payments. These draws were structured as loans, but for most of 2022 and 2023, Schechter did not pay them down. They simply remained on ACGT's books. From time to time, Schechter would direct Cherry to draw these funds for her rather than doing so herself.

30.     In 2022 alone, Schechter's personal liability to ACGT, as shown on their formal balance sheets, totaled at least $455,000. It was not until mid-2023 that Schechter took any significant steps towards paying down her debt.

31.     Fourth, for the first several years of ACGT's operations, Schechter was making business decisions while under the influence of a debilitating cocaine addiction.

32.     Between 2021 and 2022, Schechter's cocaine use had become so rampant that multiple ACGT employees filed complaints concerning her erratic and dangerous behavior, and at least one employee quit the company as a result.

33.     In or about May 2022, the ACGT board held an off-site meeting at an office space in New York City. During this meeting, Schechter repeatedly used cocaine in a public bathroom attached to the facility.

34.     Shortly after the off-site meeting, facility staff for the building submitted a complaint to the ACGT team that noted Schechter's cocaine use in the public facility, which resulted in cocaine residue and drug paraphernalia being left where members of the public, including minors, could have accessed it.

35.     On receipt of this complaint, ACGT staff, including Cherry and General Counsel Patrick Manasse, determined to stage an intervention for Schechter to alert her to the need for change. This intervention was held in or about June 2022.

36.     As a result of this intervention, Schechter enrolled in an inpatient rehab facility in Pennsylvania for 90 days.

37.     ACGT directly paid half of the cost of Schechter's rehab stay: a sum which totaled nearly $25,000. This was recorded as a "medical expense" on the Company's books.

38.     As a result of Schechter's profligate spending, ACGT entered the spring of 2023 in dire financial straits.

39.     Throughout this period, Cherry remained a valued and essential member of the ACGT team. On or about May 1, 2023, Schechter confirmed this appraisal to Cherry via text message: "you've been fucking nailing it."

**C.     Cherry Becomes the Scapegoat.**

40.     ACGT's cash troubles began coming to a head in or about March 2023, as the convertible notes from the first funding round approached maturity.

41.     In late March 2023, Cherry was told that his compensation package would have to be renegotiated as a result of ACGT's dire financial projections. Cherry and ACGT's counsel negotiated the terms of an updated employment agreement between late March and early April 2023.

42.     On or about April 5, 2023, Cherry received by e-mail an updated employment letter which compressed his pay by 40%, decreasing it just $90,000 a year (such letter, the "April 2023 Agreement"). On information and belief, most other ACGT officers and employees received only a 10% pay cut. A true and correct copy of the April 2023 Agreement is attached hereto as Exhibit B.

43.     As consideration for this significant compensation reduction, ACGT promised Cherry, among other things, that ACGT would increase his equity to 5% upon implementation of the updated equity plan. Implementation of this plan was expected to occur no later than July 5, 2023 (exactly 3 months after receipt of the April 2023 Agreement). That equity grant was never made, despite Cherry's significant pay reduction.

44.     In March and April of 2023, ACGT management held a series of calls with investors to push for a restructuring of the funding notes. It was clear to all inside the company by this point

that if the investors were to demand repayment of the debt (rather than convert to equity), ACGT would immediately be bankrupt.

45.     On or about April 27, 2023, on the last of the investor calls, Cherry delivered a scripted presentation that laid out a roadmap for ACGT to reach full profitability. Following Cherry's presentation, however, ACGT's Chief Technology Officer ("CTO") claimed that the chances of ACGT's survival were very slim, directly contradicting Cherry's remarks.

46.     The CTO's rant about the impending risk of default caused consternation among the investors, who told Cherry, in a text message, to "shut him [the CTO] down."

47.     However, Schechter and the other team members took the CTO's side after the call ended. Schechter texted the CTO that he "did the right thing" by contradicting Cherry's prepared remarks in front of the full investor audience.

48.     On information and belief, the statements by the CTO, and Schechter's endorsement of them, led several investors to believe that Cherry had directly lied to them in his prepared remarks. Schechter did nothing to correct this inaccurate belief—a sign of worse to come.

49.     On or about May 15, 2023, less than three weeks after the investor call, Schechter called Cherry and berated him about his use of the ACGT corporate card. She claimed that Cherry had charged approximately $8,000 in personal expenses to their corporate account over the last several months.

50.     Cherry was shocked to receive this call because, up to that date, no scrutiny had been placed on his corporate credit card charges, despite all statements being sent directly to Schechter's home. He also was aware that Schechter herself had been using hundreds of thousands of company dollars for her own personal expenses. Most importantly, he knew that the accusations were untrue.

51.     Shortly after the May 15 call from Schechter, Cherry prepared a detailed table of his recent corporate card transactions. This table contained a chronological list of his transactions, along with receipts and explanations as to why they were legitimate business transactions, such as client gifts or investor dinners. Cherry sent this table to ACGT General Counsel Patrick Manasse on or about May 25, 2023.

52.     Also on or about May 25, 2023, Cherry made an offer to Schechter and another associate to cover a portion of those corporate expenses with his own personal funds. He did so in a good faith effort to ameliorate the conflict and maintain peace among people he valued at a job he loved and excelled at, though he strongly believed (and the evidence showed) that he had acted properly.

53.     After Cherry sent this table and proposal on or about May 25, he heard nothing more from Schechter or other team members regarding his corporate credit card use. He continued to use the corporate card in support of his COO duties throughout the summer of 2023, and did not notice any policy change with regard to his business spending.

54.     By August of 2023, ACGT's cash crunch had progressed to the point that the company was now deciding which of its bills to pay. Consistent with past practice, it was usually Schechter's friends and associates who were paid before others. On or about August 17, 2023, Schechter emailed Cherry to direct a payment to her business partner and to withhold payment of overdue invoices to the company's contract Chief Financial Officer ("CFO").

55.     On or about August 21, 2023, it became clear to Cherry that ACGT was only a few weeks from bankruptcy, and that Schechter and the other team members were fully aware of this. Cherry calculated that the company would exhaust its cash at the end of the first week of October, 2023. After observing Schechter's refusal to pay outstanding invoices to people who had lost her

favor, and noting that his equity compensation had never been delivered, Cherry became concerned that he was next on Schechter's do-not-pay list.

56.     Later that day, Cherry calculated his future pay through the first week of October, 2023, and issued a salary advance of that amount to himself. He did so using the standard documented processes by which ACGT team members regularly issued themselves pay advances, and under the full assumption that he would be working through that final week of funding.

57.     On or about August 23, 2023, Schechter called Cherry to confirm that he had made the advance on August 21. After hanging up, Schechter sent an email to Cherry, summarily firing him.

### D.   Schechter engages in a campaign of lies to pin ACGT's downfall on Cherry.

58.     With the email of August 23, Schechter and ACGT's treatment of Cherry entered a new stage. They embarked on a campaign of affirmative falsehoods: first to Cherry himself, and then to third parties, such as Cherry's colleagues, his family, his friends, and even to law enforcement agencies.

59.     The falsehoods began with Schechter's August 23 email terminating Cherry's employment. In that email, Schechter claimed that the "charges inappropriately placed on [his] Amex account" and the advance made "without permission, approval, or even notification" amounted to "egregious financial mismanagement."

60.     These characterizations were false. Cherry's audit of the charges to his own corporate card (for which Schechter received the bills in the mail each month) had established business purposes for each one. Or, Cherry otherwise noted that the charge was an inadvertent error (which Cherry had offered to pay back). At no point prior to his termination had Schechter

or others on the ACGT board taken issue with his continued use of corporate funds in the course of his work tasks.

61.     Further, the cash advance of August 21 was made consistent with ACGT corporate practice. It was standard for ACGT officers to take out advances on their pay or for Schechter to direct Cherry to do so, and this practice was documented in corporate records and bookkeeping software.  At no point prior to Cherry's termination was this practice criticized or even scrutinized by his fellow team members—which is not surprising, given that the CEO herself had outstanding debts to the company of hundreds of thousands of dollars.

62.     On information and belief, immediately after terminating Cherry's employment, Schechter went on to call the investors closest to Cherry, including his future father-in-law—as well as the godmother to Cherry's son who was also Cherry's fiancée's best friend. On these calls, Schechter repeated the falsehoods expressed in her termination email about "egregious financial mismanagement," and further stated that Cherry had committed crimes, in that he had actively been embezzling funds from the company.

63.     On information and belief, Schechter's calls caused these investors to believe that Cherry had potentially stolen millions of dollars from ACGT.

64.     On or about September 18, 2023, ACGT's counsel sent a letter to Cherry on behalf of ACGT following this termination. A true and correct copy of this letter is attached hereto as Exhibit C. In this letter, ACGT falsely accused Cherry of theft of company funds; falsely claimed that Cherry had admitted that many of his corporate card charges were theft; and effectively tried to extort Cherry by seeking immediate restitution of the funds it claimed were "illegally obtained."

65.     In addition, ACGT wrote that due to Cherry's alleged "criminal activity," any "potential claims to financial interest" in ACGT by Cherry—which would include his vested equity share in ACGT—had been "nullified and extinguished."

66.     Over the next few months, Cherry's legal counsel exchanged correspondence with ACGT's counsel, seeking a mutually amenable way forward in light of Cherry's extensive grounds for suit (which included wrongful termination, breach of contract, and retaliation against whistleblowing activity). These efforts were largely unsuccessful.

67.     In early January 2024, Schechter and/or ACGT escalated their campaign against Cherry by making false reports to the New York Police Department ("NYPD"), telling the police that Cherry had stolen $51,000 from ACGT, and that he had committed embezzlement, conversion, and fraud.

68.     On January 16, 2024, as a direct result of those false statements to the NYPD, a warrant squad comprising six to eight officers arrived at Cherry's apartment and demanded entry in the early morning darkness, causing physical danger and extensive emotional distress to Cherry and his family members.

69.     Cherry's then-counsel persuaded the NYPD officers to leave without incident, on the promise that Cherry would present himself to the 8th Precinct later that day. When Cherry arrived at the station, the warrant squad detective handling his matter acknowledged the outrageous nature of the morning's confrontation and offered his personal apologies.

70.     The detective went on to note that the testimony provided regarding Cherry's alleged wrongdoing was so inconclusive that he would be issuing a desk appearance ticket for larceny of property worth $1,000-$3,000, a far cry from the $51,000 alleged by Schechter and/or ACGT.

71.     In or around January 2024, upon information and belief, Schechter and/or ACGT provided similar false information concerning Cherry to the Manhattan District Attorney's office, including that Cherry had committed embezzlement, conversion, misuse of authority, and fraud. Schechter and ACGT went so far as to rename Cherry's Excel files they sent to the District Attorney's office, changing the name of the spreadsheet from "Audited Transactions" to "Cherry Personal Expenses," in an apparent attempt to make it appear that Cherry had implicitly admitted that certain corporate card charges were personal expenses.

72.     On or about January 31, 2024, counsel for ACGT sent an email repeating the same lies to the former contract CFO of ACGT, whose invoices ACGT was now refusing to pay. ACGT's counsel wrote that Cherry was "currently under criminal investigation," that "he has been arrested," and that "the Manhattan District Attorney is bringing a case against him." A true and correct copy of this letter is attached hereto as Exhibit D. On information and belief, this letter was sent at the direction of Schechter.

73.     These statements presented a remarkably false picture of the situation. Any investigation of Cherry's conduct which may have been ongoing at that time was the direct result of Schechter's and ACGT's false testimony to law enforcement. Cherry's "arrest" was merely a desk appearance for which the detective handling the case had apologized. And the statement that the District Attorney "is bringing a case" was untrue, as no charges have been brought against Cherry on these grounds.

74.     On or about March 11, 2024, ACGT's counsel, who worked at the direction of Schechter and ACGT, sent another letter to the former interim CFO, which continued to defame Cherry. A true and correct copy of this letter is attached hereto as Exhibit E. In the letter, ACGT increased the size of Cherry's alleged theft, falsely claiming: "Mr. Cherry was embezzling large

sums of money from the Company, in excess of $100,000 USD, and was generally engaging in fraud, conversion, and various torts and other criminal acts." The letter also repeated ACGT's lie about a criminal case: "the Manhattan District Attorney is bringing a criminal case against him." Finally, they characterized Cherry as a "rogue agent" who "disregard[ed] orders" and "criminally enrich[ed] himself at the expense of the company." On information and belief, this letter was also sent at the direction of Schechter.

75.     Finally, ACGT wrote that their campaign of defamation would continue: "we will alert the Manhattan DA that Mr. Cherry was making large unauthorized payments to a close family friend, [the CFO], in violation of the direct orders of his superiors and of his duty of loyalty to the Company." This false statement was particularly brazen as both ACGT and the CFO knew that all of the CFO's bills to the company had been seen and confirmed by the ACGT board in their regular meetings.

76.     On information and belief, Schechter and ACGT continued to repeat and broadcast these false statements about Cherry to the Manhattan District Attorney's office shortly after sending the letter of March 11, 2024. Because of these false claims, Cherry was forced to expend significant funds to hire criminal counsel to rebut the fabricated allegations.

**E.  Damages and Aftermath.**

77.     In the months since Schechter's and ACGT's campaign of lies began, significant harm has been caused to Cherry, his career, and his family have compounded.

78.     Cherry has suffered extensive monetary damages due to Schechter's and ACGT's lies, including lost wages as well as extensive attorney's fees required to defend against a criminal investigation founded on false reports to law enforcement.

79.     Cherry's relationships have also been severely harmed due to Schechter's and ACGT's lies. His engagement was broken off; his friendships and business relationships with the ACGT investors and the former CFO were irreparably damaged; and each new relationship he attempts to form is under the shadow of a damaged reputation.

80.     Cherry's employment was directly and immediately harmed by Schechter's and ACGT's lies, as they terminated his position as COO on false pretenses, and took away his equity in a company that he worked so hard to make a success. Those same lies continue to harm Cherry's employment prospects.

81.     Finally, this oppressive and unjustified ordeal has caused Cherry's health and general well-being to suffer. From the mental anguish of being terminated based on a CEO's repeated lies, to having law enforcement show up at his door to arrest him because of these lies, and now having to leave New York entirely, the falsehoods told by Schechter and ACGT have materially upended his life and the lives of those he loves.

**F.  Conclusion.**

82.     Laura Schechter and ACGT Creative, Inc. have embarked on a months-long campaign of lies, defamation, and outright falsehoods concerning Cherry's conduct in order to hide the evidence of Schechter's own financial mismanagement, drug use, and misappropriation of significant company funds. These lies have destroyed the life of an innocent man who only ever wanted the best for his workplace and his colleagues. Cherry deserves to be made whole.

**CLAIMS FOR RELIEF**

**CLAIM 1 – DEFAMATION**
**(against all Defendants)**

83.     Cherry incorporates by reference each of the allegations contained in ¶¶ 1–82 above as if fully set forth herein.

84.     Schechter and ACGT have made and repeated numerous false statements concerning Cherry up through and including March, 2024, including, without limitation:

- That Cherry stole $51,000 from ACGT;

- That Cherry stole $100,000 from ACGT;

- That Cherry committed embezzlement against ACGT;

- That Cherry converted company funds from ACGT;

- That Cherry misused his authority as COO of ACGT;

- That Cherry committed fraud against ACGT and Schechter;

- That Cherry sent unauthorized payments to the former CFO of ACGT;

- That Cherry is under active criminal investigation; and

- That Cherry has had a criminal case brought and pending against him by the Manhattan District Attorney's office.

85.     These false statements by Schechter and ACGT were made to third parties, including to, without limitation:

- The ACGT investor community;

- ACGT employees and outside advisors;

- The New York Police Department;

- The New York County District Attorney;

- ACGT's former CFO; and

- Cherry's fiancée.

86.     Neither Schechter nor ACGT had any privilege or authorization whatsoever to make any of these false statements concerning Cherry, which they did intentionally, knowing that they were false.

19

87.     By reason of the making of these false statements, Cherry has suffered extensive and incalculable damages, including monetary damages as well as harms to his relationships, career, health, and well-being.

88.     By virtue of the foregoing, Schechter and ACGT have defamed Cherry, and are jointly and severally liable to Cherry for all damages that have accrued thereby.

## CLAIM 2 – BREACH OF CONTRACT
### (against ACGT)

89.     Cherry incorporates by reference each of the allegations contained in ¶¶ 1–82 above as if fully set forth herein.

90.     On March 14, 2020, Cherry and ACGT entered into the March 2020 Agreement, a valid, enforceable, and binding contract.

91.     Pursuant to the terms of the March 2020 Agreement, Cherry agreed to serve first as Managing Director, then as COO of ACGT, in full consideration for this contract.

92.     Pursuant to the terms of the March 2020 Agreement, ACGT agreed to compensate Cherry with:

- A salary component consisting of a salary of $150,000 USD per year (paid every two weeks) starting when ACGT has raised $250,000 USD; and

- An equity component consisting of 3% of the total equity value of ACGT, with a standard 4-year vesting period, a 1-year cliff and reasonable anti-dilution protections.

93.     Cherry met all his obligations under the March 2020 Agreement by performing his duties under the contract, first as Managing Director of ACGT, then as its COO.

94.     Specifically, Cherry's performance included preparing investor materials, communicating with prospective investors, securing and closing the initial round of financing for ACGT (notably through his family members and close friends), overseeing ACGT operations and

continued development of ACGT, and exploring ACGT's new partnerships and strategic corporate relationships.

95.     Since ACGT raised $750,000 in convertible notes on March 30, 2020, *i.e.* two weeks after this agreement entered into effect, all conditions precedent were satisfied.

96.     On April 5, 2023, Cherry and ACGT entered into a valid, enforceable, and binding contract.

97.     The April 2023 Agreement was intended by the parties to update the terms of the March 2020 Agreement, in light of ACGT's financial difficulties at the time. The terms of the April 2023 Agreement were negotiated by Cherry and ACGT's counsel in late March and early April 2023 through calls and written correspondence.

98.     As the last act of this negotiation process, Cherry sent ACGT proposed terms, to which ACGT assented on April 5, 2023 via written correspondence to Cherry documenting the same.

99.     Pursuant to the terms of the April 2023 Agreement, Cherry agreed to a compensation reduction amounting to 40% of his then-current salary of $150,000 per annum, *i.e.* a reduction of his salary by $60,000 per annum.

100.    Pursuant to the terms of the April 2023 Agreement, ACGT agreed to compensate Cherry with, *inter alia*, an increase in his equity ownership share of ACGT to a total of 5%.

101.    After entering into the April 2023 Agreement, Cherry continued to fully perform his duties as COO, and ACGT paid him his salary in accordance with the new terms, *i.e.* the reduced compensation base of $90,000 a year.

102.    On July 6, 2023, ACGT materially and substantially breached the April 2023 Agreement by failing to implement the equity plan and timely issue Cherry's equity shares.

103.     On September 18, 2023, ACGT further materially and substantially breached both the March 2020 Agreement and the April 2023 Agreement by purporting to unilaterally and unlawfully nullify and extinguish Cherry's financial interest in ACGT, including but not limited to his equity share in ACGT earned under both agreements.

104.     As a direct, natural, probable, and foreseeable consequence of ACGT's breaches, Cherry has suffered general and consequential damages.

105.     By virtue of the foregoing, ACGT has breached its contracts with Cherry, and is liable to him for all damages that have accrued thereby.

### CLAIM 3 – UNJUST ENRICHMENT
### (against Defendant ACGT)

106.     Cherry incorporates by reference each of the allegations contained in ¶¶ 1–82 above as if fully set forth herein.

107.     On April 5, 2023, Cherry agreed to a compensation reduction of 40% of his then $150,000 salary, *i.e.* a reduction of his salary by $60,000, to the benefit of ACGT.

108.     Between April 5, 2023, and August 23, 2023, ACGT received full performance of Cherry's services, previously valued at $150,000 per year, and paid only $90,000 per year in exchange for these services.

109.     ACGT was enriched by virtue of Cherry providing ACGT with full performance of his duties as COO, at such reduced compensation.

110.     ACGT was aware of and had knowledge that Cherry was not providing the benefit gratuitously and that his compensation reduction had a monetary value of $60,000 a year.

111.     ACGT was aware and had knowledge that Cherry was providing the benefit in reliance of ACGT's promise to confer upon him the benefits enumerated in the April 5, 2023 letter, including but not limited to an increase of his equity shares in ACGT to 5%.

112.     ACGT induced Cherry to continue serving as COO, knowing it would benefit from the work and services performed by Cherry.

113.     The work and services that Cherry performed for ACGT inured to the benefit of ACGT, at Cherry's expense.

114.     Cherry has demanded that ACGT deliver or otherwise make restitution to Cherry for his 5% equity share, and ACGT has refused to do so.

115.     ACGT has knowingly retained Cherry's 5% equity share inequitably and at Cherry's expense.

116.     By virtue of the foregoing, ACGT has been unjustly enriched at Cherry's expense, and it is against equity and good conscience to permit ACGT to retain the benefit conferred.

## CLAIM 4 – PROMISSORY ESTOPPEL
### (against Defendant ACGT)

117.     Cherry incorporates by reference each of the allegations contained in ¶¶ 1–82 above as if fully set forth herein.

118.     Cherry and ACGT entered into valid and enforceable contracts establishing the terms of his employment. In these contracts, ACGT promised to vest a certain percentage of equity in exchange for Cherry's performance.

119.     Cherry complied with all his obligations pursuant to the March 2020 Agreement and the April 2023 Agreement.

120.     Cherry reasonably relied upon ACGT's promise to deliver the agreed-upon amount of equity pursuant to the March 2020 Agreement and the April 2023 Agreement.

121.     ACGT failed to comply with its promise to deliver the agreed-upon amount of equity pursuant to the March 2020 Agreement and the April 2023 Agreement.

122.   Cherry relied upon ACGT's promises to his detriment. He agreed to a 40% reduction in base compensation based on ACGT's promise in the April 2023 Agreement. Cherry would not have done so but for ACGT's promise to deliver 5% of total equity.

123.   As a direct and proximal result of ACGT's failure to fulfill its promise, Cherry has suffered damages.

124.   By virtue of the foregoing, ACGT is liable to Cherry under the doctrine of promissory estoppel.

## CLAIM 5 – DECLARATORY RELIEF
### (against Defendant ACGT)

125.   Cherry incorporates by reference each of the allegations contained in ¶¶ 1–82 above as if fully set forth herein.

126.   An actual controversy has arisen and now exists between Cherry and ACGT regarding the validity of Cherry's claim to the equity compensation promised under the March 2020 Agreement and April 2023 Agreement.

127.   Resolution of this particular controversy would serve a useful purpose in clarifying the legal relations at issue, and could settle the controversy between the parties in its entirety.

128.   By virtue of the foregoing, this Court is properly entitled to exercise its discretion and issue a declaratory judgment under 28 U.S.C. §§ 2201–2202, setting forth the parties' relation to each other as a matter of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(a)   Enter an award for actual, presumed, and punitive damages against all Defendants on Plaintiff's defamation claim, in an amount to be determined;

(b)   Enter a preliminary order immediately enjoining all Defendants from making further false and defamatory statements about Plaintiff during the pendency of this action;

(c)     Enter an order enjoining all Defendants from making further false and defamatory statements about Plaintiff in the future;

(d)     Enter an award for compensatory damages against Defendant ACGT for all breaches of the March 2020 Agreement and the April 2023 Agreement, in an amount to be proven at trial;

(e)     Enter a declaration that Plaintiff is possessed of valid and durable interests in equity of ACGT Creative, Inc. under both the March 2020 Agreement and the April 2023 Agreement;

(f)     Enter an order directing specific performance of the equity compensation terms of the April 2023 Agreement under a theory of unjust enrichment;

(g)     Enter an order awarding detrimental reliance damages or specific performance of the equity compensation terms of the April 2023 Agreement under a theory of promissory estoppel, whichever better avoids injustice;

(h)     Award Plaintiff pre-judgment and post-judgment interest, as well as an award of attorneys' fees and costs; and

(i)     Award all other relief this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury on all issues so triable.


Dated: February 27, 2025

Respectfully submitted,

*/s/ Constantine P. Economides*

**DYNAMIS LLP**
Constantine P. Economides
Fla Bar #118177
ceconomides@dynamisllp.com
1111 Brickell Ave., 10th Floor
Miami, FL 33131
Telephone: (305) 985-2959

Eric Rosen (*pro hac vice* forthcoming)
225 Franklin Street, 26th Floor
Boston, MA 02110
(617) 802-9157
erosen@dynamisllp.com

**CERTIFICATE OF SERVICE**

I certify that that on February 27, 2025, a true and correct copy of the above pleading was filed with the Court's CM/ECF system, which has generated and delivered electronic notices of filing to all counsel of record who have consented to electronic service.

/s/ Constantine P. Economides
Constantine P. Economides

# EXHIBIT A

**ACGT Creative Inc.**
48 Crawford Road
Westport, CT 06880

March 12, 2020

Zachary Cherry
1601 Forum Place Suite 1010
West Palm Beach, FL 33401

Dear Mr. Cherry:

      We are pleased to offer you (the "**Consultant**") an engagement to provide consulting services to ACGT Creative, Inc. ("**ACGT**"). This letter agreement ("**Agreement**") will describe the basis on which Consultant has been engaged and sets forth the terms and conditions whereby Consultant agrees to provide the services described in this Agreement.  This engagement shall remain 'At Will' up and until the execution of and subject to the normal terms and conditions in a formal employment or engagement agreement.  This Agreement shall serve as the basis of and ultimately shall be supplanted by that same aforementioned formalized agreement

**1.**     **Engagement and Services**.  ACGT agrees to retain Consultant as an independent contractor on a non-exclusive basis, specifically to serve as a Managing Director to ACGT in connection with ACGT's business of media production (the "**Business**"), provide general consulting services in furtherance of raising capital, developing the business, and provide general consultancy services and day-to-day operational advice to ACGT (the "**Services**").

**2.**     **Compensation and Expenses**.

    a.) Salary Component: Salary of $150,000 USD per year (paid every two weeks) starting only once ACGT has raised $250,000 USD.  The aforementioned $250,000 USD shall not include the $250,000 confirmed investment by Bill Woodward.  This also does not include past funds raised, money lent by Laura Schechter to the company, or current recognized revenues

    Salary will increase to  $200,000 USD per year (paid every two weeks) once the company has raised a minimum of $1.75 million USD, again not including the Bill Woodward investment of $250,000

    Further bonuses or increases will be tied to revenues, Business and/or Consultant's performance at the discretion of (management, CEO, Board of Directors or Compensation Committee etc.)

    b.) Equity Component: 3.0% of the higher of current total equity value or total equity value of the current financing round. (share numbers to be confirmed) -- with a standard 4 year vesting period, a 1 year cliff and reasonable anti-dilution protections

    c.) Expense Coverage: Company shall issue Zac a corporate card or implement a similar standard reimbursement mechanism for customary expense coverage for travel, capital raising and/or company marketing expenditures.

ACGT Creative Inc.
March ___, 2020
Page **2** of 6

**3.**     <u>**Role and Position**</u>.  Consultant shall initially hold the position and title of Managing Director. This role shall ultimately evolve into Chief Operating Officer of ACGT

**4.**     <u>**Services.**</u>   The following sets forth the list of expected responsibilities for Consultant.   The Services include but are not limited to the following:

> Preparation of Investor Materials: Deck, Executive Summary, Financials, Corporate Documents, Data Room, Cap Table, and any other necessary collaterals

> Communication with Prospective Investors, including emails, phone calls, and in person meetings

> Securing and closing initial round of funding for $2.0 million or more

> Oversight of operations and continued development of ACGT/Inside Out/Hookline growth strategy

> Management of talent sourcing, development, and monetization of existing IP and content

> Exploration of partnerships and strategic corporate relationships

> Animation and content production management

**5.**     <u>**Effective Date.**</u>  The date on which ACGT signs this Agreement shall be the "Effective Date."

**6.**     <u>**Term and Termination.**</u>   The term of this Agreement shall commence upon the Effective Date and shall continue for a period of twelve (12) months from the Effective Date, unless this Agreement is terminated earlier as hereinafter provided (the "<u>**Initial Term**</u>").  If not terminated earlier as hereinafter provided, after the expiration of the Initial Term, this Agreement shall renew automatically for additional successive twelve (12) month terms (each, a "<u>**Renewal Term**</u>," and together with the Initial Term, the "<u>**Term**</u>"), unless either party gives written notice of non-renewal to the other party within ninety (90) days before the expiration of the Initial Term or any Renewal Term.  Either party may terminate this Agreement, with or without cause, at any time by providing thirty (30) days written notice to the other party.

**7.**     <u>**Relationship of the Parties**</u>.  Consultant is an independent contractor and is solely responsible for remitting any and all taxes, or other amounts that may be due to any federal, state or local governmental entity, pertaining to any compensation paid by ACGT to Consultant pursuant to this Agreement.  ACGT will not make any deductions from or withhold any income, employment or other taxes from the compensation due to Consultant for services rendered by Consultant pursuant to this Agreement.

**8.**     <u>**Confidentiality.**</u> "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of parts or equipment.

ACGT Creative Inc.
March ___, 2020
Page **3** of 6

Consultant will not, during or subsequent to the term of this Agreement, use the Company's Confidential Information for any purpose whatsoever other than the performance of the Services on behalf of the Company or disclose the Company's Confidential Information to any third party other than in the performance of the Services on behalf of the Company, and said Confidential Information shall remain the sole property of the Company. Consultant further agrees to take all reasonable precautions to prevent any unauthorized disclosure of such Confidential Information including, but not limited to, having each employee or contractor of Consultant, if any, with access to any Confidential Information, execute a nondisclosure agreement containing provisions in the Company's favor substantially similar to Sections 8, 9 and 11 of this Agreement. Confidential Information does not include information which (i) is previously known to Consultant at the time of disclosure to Consultant by the Company as evidenced by written records of Consultant, (ii) has become publicly known and made generally available through no wrongful act of Consultant or (iii) has been rightfully received by Consultant from a third party who is authorized to make such disclosure.

Consultant agrees that Consultant will not, during the term of this Agreement, improperly use or disclose any proprietary information or trade secrets of any former or current employer or other person or entity with which Consultant has an agreement or duty to keep in confidence, and that Consultant will not bring onto the premises of the Company any unpublished document or proprietary information belonging to such employer, person or entity unless consented to in writing by such employer, person or entity.

Consultant recognizes that the Company has received and, in the future, will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that Consultant owes the Company and such third parties, during the term of this Agreement and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out the Services for the Company consistent with the Company's agreement with such third party.

Upon the termination of this Agreement, or upon Company's earlier request, Consultant will deliver to the Company all of the Company's property, including but not limited to all electronically stored information and passwords to access such property, or Confidential Information in tangible form that Consultant may have in Consultant's possession or control.

**9.    Ownership.** Consultant agrees that all material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets (collectively, "Inventions") conceived, made or discovered by Consultant, solely or in collaboration with others, during the period of this Agreement which relate in any manner to the business of the Company that Consultant may be directed to undertake, investigate or experiment with or which Consultant may become associated with in work, investigation or experimentation in the line of business of Company in performing the Services hereunder, are the sole property of the Company. Consultant further agrees to assign (or cause to be assigned) and does hereby assign fully to the Company all such Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.

Consultant agrees to assist Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work

ACGT Creative Inc.
March ___, 2020
Page **4** of 6

rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  Consultant further agrees that Consultant's obligation to execute or cause to be executed, when it is in Consultant's power to do so, any such instrument or papers shall continue after the termination of this Agreement.

Consultant agrees that if, in the course of performing the Services, Consultant incorporates into any Invention developed hereunder any invention, improvement, development, concept, discovery or other proprietary information owned by Consultant or in which Consultant has an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, perpetual, irrevocable, worldwide license to make, have made, modify, use and sell such item as part of or in connection with such Invention.  Consultant will not incorporate any invention, improvement, development, concept, discovery or other proprietary information owned by any third party into any Invention without Company's prior written permission.

Consultant agrees that if the Company is unable because of Consultant's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Consultant's signature to apply for or to pursue any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company above, then Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney in fact, to act for and in Consultant's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyright and mask work registrations thereon with the same legal force and effect as if executed by Consultant.

**10.** **Reports.**  Consultant agrees that it will from time to time during the term of this Agreement or any extension thereof keep the Company advised as to Consultant's progress in performing the Services hereunder and that Consultant will, as requested by the Company, prepare written reports with respect thereto.  It is understood that the time required in the preparation of such written reports shall be considered time devoted to the performance of Consultant's Services.

**11.** **Conflicting Obligations.**  In view of Consultant's access to the Company's trade secrets and proprietary know-how, Consultant further agrees that Consultant will not, without Company's prior written consent, design identical or substantially similar designs as those developed under this Agreement for any third party during the term of this Agreement and for a period of twenty four (24) months after the termination of this Agreement.

**12.** **Limitation of Liability.**  Consultant's liability for any reason and on any cause of action shall be limited to the aggregate amount actually paid by ACGT to Consultant under this Agreement as compensation for the Services.  In no event shall Consultant be liable to ACGT or anyone acting through ACGT under any legal theory (including, without limitation, breach of contract, strict liability,

ACGT Creative Inc.
March ___, 2020
Page **5** of 6

negligence or any other legal theory) for incidental, consequential, indirect, special, or exemplary damages arising out of or relating to this Agreement.

13.    **Amendment and Governing Law.**  This Agreement may not be amended or modified except by an express written amendment signed by both ACGT and Consultant.  The terms of this Agreement and the resolution of any disputes will be governed by Florida law with exclusive jurisdiction residing in the courts located in Palm Beach County, Florida.

14.    **Attorneys' Fees.**  If any lawsuit, arbitration or other legal proceeding (including, without limitation, any appellate proceeding) arises in connection with the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to receive from the other party, the prevailing party's costs and expenses, including reasonable attorneys' fees, charges and disbursements incurred in connection therewith, in preparation therefor and on appeal therefrom, which amounts shall be included in any judgment therein.

15.    **Notices.**  Any notice or other communications required or permitted hereunder shall be in writing and shall be deemed effective (i) upon personal delivery, if delivered by hand, (ii) three (3) days after the date of deposit in the U.S. mail, if mailed by certified or registered mail (return receipt requested), or (iii) on the next business day, if mailed by an overnight mail service to the parties at the following addresses:

        If to ACGT:            ACGT Creative Inc.
                               48 Crawford Road
                               Westport, CT 06880
                               Attention:  Patrick Manasse
                               Fax Number:  (____) _____
                               Email: _____

        If to Consultant:      Zachary Cherry
                               1601 Forum Place - Suite 1010
                               West Palm Beach, FL 33401
                               Fax Number:  (561) 684-3765
                               Email:  zcherry@cherrycapllc.com

ACGT Creative Inc.
March ___, 2020
Page **6** of 6

**16.     Counterparts.**   The parties may execute this Agreement in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  The parties may deliver executed signature pages to this Agreement by facsimile or email transmission.

You may indicate your agreement with these terms and accept the terms of this Agreement by signing and dating this Agreement below and returning a copy to me.

Very truly yours,

ACGT CREATIVE INC.

By:_____

Date: March _____, 2020
Laura Schechter

ACKNOWLEDGED AND AGREED:
Consultant has read and accepts the terms of this Agreement.

Digitally signed by Zachary A. Cherry
DN: cn=Zachary A. Cherry, o, ou,
email=zac@icontheory.com, c=US
Date: 2020.03.14 20:43:18 -04'00'

By:_____

Date: March __14__, 2020
Zachary A. Cherry

EXHIBIT B

Hey Zac,

Thank you for putting this together.

As discussed, the preference is to have a structure which focuses on generating revenue and raising capital while at the same time limiting the complexity of cap tables for various projects.

As a start, the new $90k base is already approved, to make the compressed salary structure work for current obligations it shall be initiated with a transition payment of $3K upon execution of this agreement, with the balance of $87K in compressed base to commence on this upcoming April 7th, 2023 payroll.

Return to your original base salary of $150k shall occur in the event of a financing of $3 million or more and a raise to $200k in the event of a financing of $5 million or more. Reasonability and good faith discussion shall be applied here in the event a financing is executed in multiple tranches etc. or a financing of less than $3.0 million dollars is secured by StoryGiants related to relief from the compressed base salary.

In addition, you will receive a bonus of 1% of financing originated and closed for the company in excess of $1 million to be included in your next pay period and an additional 1% of financing originated and closed for the company in excess of $1 million to be included in your end of year bonus.

You will also receive a bonus of 1% of financing originated and closed for any individual project in excess of $100k to be included in your next pay period and an additional 1% of financing originated and closed for the company in excess of $100k to be included in your end of year bonus.

For projects which you have originated, you will receive 5% of revenues realized by StoryGiants once StoryGiants has cleared $500k in revenues, for a period of 4 years.

In the event of a sale or liquidity event ('Liquidity Event") of an individual property, you will receive 5% of the proceeds paid to StoryGiants related to that Individual property.

As there should also be a focus on what we have on the slate today, this will apply to the projects originated to date:
- FrankApe,
- Baby Witch, and,
- PJ Panda

For sake of clarity, project level financing bonuses of 1% and 1% applies to any projects not just those listed above.

Magick Show – solely in the event, you are able to facilitate a sale or effect revenues to StoryGiants resulting from a contact to whom you introduce this property, you will

receive 5% of the proceeds realized by StoryGiants. For specificity, these would be parties to which StoryGiants has no current relationship, starting with Michael Kagan of Range Media. There may be additional names to be explicitly added here. In that case written approval by Laura is required for a party to qualify for this additional compensation. For clarity, absent value creation resulting from a specific introduction made by you, there would be no incremental compensation related to Magick Show.

Lastly, an increase of 1% in total company equity is approved, taking your total to 5%. Vesting period for this additional percent will start upon implementation of the equity plan (no later than 3 months from today).

Best,
Patrick


ACKNOWLEDGED & ACCEPTED:


Zachary A. Cherry
April 5, 2023

EXHIBIT C

18 September, 2023

<u>ACGT Creative Inc.</u>

Zachary Cherry
200 E 64th Street, Apt 4A
New York, NY 10065
zcherry@gmail.com

<u>Re: Termination and Restitution of Funds</u>

Dear Mr. Cherry,

This letter follows the official notice already provided over the phone on August 23, 2023 and followed up in writing by email from Laura Schechter, CEO of ACGT Creative Inc ("Company") on the same day to inform you that your employment with ACGT Creative Inc. was terminated.

As discussed, the reason for your termination are the theft of Company funds, egregious financial mismanagement, and betrayal of trust that was placed in you. As you are fully aware, you were in a position of trust with direct access to Company finances and accounts. As such, you were fully aware that the Company is in a severely restricted cash position and has been rigorously managing cash flow.

In May of this year, the Company first discovered that you had been charging personal expenditures to the Company credit card including but not limited to groceries, Venmo charges, Ubers, online food order, restaurants, and pharmacies. In a three-month period, these charges amounted to $33,211.59 US Dollars.

While the Company accepted that some of these charges may have been related to work, you admitted that many of the charges were indeed personal and entered into discussions to reimburse the Company for charges which were personal in nature.

Company requested receipts for the expenses that were work related and these were not provided. As such, the exact amount of the charges that were personal in nature had not yet been conclusively determined.

Attached are the complete credit card statements for those three months. The Company will be reviewing all of the credit card statements since you were first issued a credit card and reserves all rights with regards to restitution of funds for which you do not have clear evidence were related to business expenses.

After this earlier significant issue about your expenditures, and the large quantities of charges inappropriately placed on your Amex account, which you admitted and we had yet to resolve, the Company discovered that without permission, approval, or even notification you had advanced eight weeks of payment to yourself. The Company investigated the matter with its own Bookkeeping Manager and confirmed that over $11,996.14dollars in unauthorized advances had been made to yourself. As you have now been terminated, these funds are to be returned immediately. Attached are the payroll notification regarding these recent unauthorized advances.

The Company will be reviewing all of the payrolls since you were first employed to ensure that no other unauthorized bonuses, advances, or payments were made to yourself. The Company will finalize its determination regarding the total amount owed by you to the Company and reserves all rights with regards to these additional amounts yet to be determined.

Given the clear and convincing evidence that you stole Company property on multiple occasions, and the serious violation of the trust that was placed in you, including your personal expenditures on a Company credit card and unauthorized advances, the Company is hereby notifying you that it is seeking immediate restitutions of all of the funds illegally obtained.

The Company is also notifying you that due to your criminal activity, the Company has determined that any potential claims to financial interest in the Company whatsoever have been nullified and extinguished.

The Company reserves all rights to press criminal charges related to embezzlement and Grand Larceny, including but not limited to New York Penal Law Article 155, larceny in the first degree in violation of Connecticut General Statutes § 53a-122, as well as seek restitution through both the criminal court or through civil court in both New York and Connecticut.

Sincerely,

Patrick Manasse

EXHIBIT D

---------- Forwarded message ---------
From: **Spencer Wolff** <spencer@generalstandards.co>
Subject: Re: Interest on Overdue Invoices Payable - January 1-31, 2024
To: Laura Schechter <schechter.laura@gmail.com>
Cc: Joe Messana <joe.messana4@gmail.com>


Hi Joe,

I represent ACGT Creative, Inc. as counsel. I am writing to inform you that Zach Cherry is currently under criminal investigation for embezzlement, conversion of Company funds, misuse of authority and fraud. He has been arrested and the Manhattan District Attorney is bringing a case against him. We are re-evaluating several contracts that he signed with service providers without Company authorization. If we become aware of any fraud, kickbacks, or other malfeasance, then we will vigorously pursue criminal as well as civil penalties.

I would highly recommend that you put your lawyer in contact with me. You should also be aware that there were several irregularities in the agreement that Mr. Cherry made with you, including unauthorized fees well above market rates. We actively contest these invoices. Please be on notice that we have alerted the Manhattan DA to these irregularities.

This letter is not intended to constitute a full statement of all damages relating to thismatter. Nor is it intended to, nor should it, be construed as a waiver, release or relinquishment of any of the Company's claims or remedies, legal or equitable, all of which are hereby expressly reserved.

Sincerely,

Spencer Wolff Esquire
Counsel to ACGT Creative, Inc.

---

2 Attachments · Scanned by Gmail ⓘ

 

EXHIBIT E



SPENCER WOLFF LAW P.C.
COUNSEL TO ACGT CREATIVE INC.
SPENCER@GENERALSTANDARDS.CO

<u>re</u>: **Messana Invoices**
Attention : James J. Canfield
Barclay Damon, LLP
1270 Avenue of the Americas
Suite 501
New York, New York 10020
212.784.5800

March 11, 2024

<u>Via email to jcanfield@barclaydamon.com</u>

Dear Mr. Canfield,

I am responding to your letter dated February 9, 2024.

On May 3, 2022, the Board of Directors of ACGT Creative Inc. (the "**Company**") provided Zachary Cherry, the COO of the Company, with a Consultant Agreement in which it approved bringing on Joe Messana (the "**Consultant**") to provide a minimum of 40 hours per week of services for a compensation of Five Thousand Dollars ($5,000 USD) per month for a period of three months. In total, a spend of $15,000 was authorized by the Board of Directors.

However, Mr. Messana has already charged the Company for $39,500 for work that occurred over 4 months, when only 3 months and $15,000 were authorized by the Board. Beyond these extraordinary sums, he is claiming an additional five months of work at $11,500 per month, far beyond any amounts permitted by the Agreement. For instance, Mr. Messana has billed $23,000 for work that supposedly occurred in October 2022 alone. In total, the fees and entertainment expenses that Mr. Messana has billed to the Company exceed $100,000, when only $15,000 was ever authorized.

The Board of Directors is concerned not only by the unauthorized and excessive fees, but also by the apparent paucity of work product produced by Mr. Messana. The Agreement authorized by the Board required that Mr. Messana provide a minimum of 40 hours of work per week to the Company. Yet, the Board members received less than a dozen emails over the six-month period that Mr. Messana was apparently working there and relatively little work product.

This is particularly troubling in light of the fact that Mr. Messana was presented to the Company as a long-time family friend of Mr. Zachary Cherry, who at the time was the COO of the Company. Mr. Cherry vouched for Mr. Messana's services and agreed to carry out the directives of the CEO and the Board. It has since been discovered that Mr. Cherry was embezzling large sums of money from the Company, in excess of $100,000 USD, and was generally engaging in fraud, conversion, and various torts and other criminal acts.

Mr. Cherry has since been arrested and the Manhattan District Attorney is bringing a criminal case against him. The Company is additionally seeking restitution of the funds stolen from it.

In your letter, you dismiss the criminal investigation into Mr. Cherry's acts as irrelevant to your Client's services and invoices. However, the fact that Mr. Cherry was acting as a rogue agent, disregarding orders from his superiors and criminally enriching himself at the expense of the Company combined with the fact that he is a long-time friend of Mr. Messana's, was Mr. Messana's direct superior and appears to have exceeded his authority to pay Mr. Messana a total of $15,000 in what was clearly not an arms-length transaction gives us pause and should greatly concern you and your client. It has all the color of fraud.

It is additionally troubling that there is no record of a signed contract between the Company and Mr. Messana. Mr. Cherry appears to have unilaterally modified the terms of the agreement with Mr. Messana and neither presented them to the Company management nor submitted an executed Agreement to Steadfast, as he was legally obliged to do. We understand that there may have been other unauthorized or fraudulent agreements signed between Mr. Cherry and Mr. Messana which have not been disclosed to the Company and we kindly ask that you share all of these with us for inclusion in our report to the Manhattan District Attorney.

The Company is currently focused on building its business and moving on from the unfortunate outcomes of Mr. Cherry's tenure. Mr. Messana has already received more than $40,000 in fees and expenses from the Company despite only $15,000 being authorized. In exchange for the execution of a Settlement Agreement, containing a full release and waiver by both parties, the Company is willing to pay Mr. Messana an additional $15,000, which will come in the form of three monthly installments of $5,000. This will bring Mr. Messana's total fees to $54,500, despite only $15,000 having been authorized by the Company.

In lieu of the proposed negotiated settlement above, the Company is more than willing to go to arbitration in New York. If we do end up litigating, we will seek full restitution of the $39,500 in unauthorized fees paid by the Company to Mr. Messana.

In addition, we will alert the Manhattan DA that Mr. Cherry was making large unauthorized payments to a close family friend, Mr. Messana, in violation of the direct orders of his superiors and of his duty of loyalty to the Company. We will further inform the Manhattan DA that Mr. Messana has billed the Company over $100,000 USD, without any executed agreement, claiming that his close family friend, Mr. Cherry, authorized these charges, despite the fact that such fees were in violation of his instructions from his superiors and lacked approval from the Board of Directors.

This letter is not a complete statement of, and is without prejudice to, the rights, remedies or defenses possessed by ACGT Creative Inc., all of which are reserved.

I am available via email and or phone to discuss this matter in greater detail and hopefully arrive at a mutually beneficial conclusion.

Sincerely,

Spencer Wolff, Esquire